LATROBE STEEL COMPANY

v.

UNITED STEELWORKERS OF AMERICA, AFL–CIO et al.

Appeal of LOCAL 1537 UNITED STEEL-WORKERS OF AMERICA.

No. 76–1080.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1976.

Decided Nov. 15, 1976.

1338

Frank J. Lucchino, Rudolph L. Milasich, Jr., Pittsburgh, Pa., for appellants; Bernard Kleiman, Chicago, Ill., of counsel.

Reed, Smith, Shaw & McClay, Henry J. Wallace, Jr., Lawrence E. Flatley, Pittsburgh, Pa., for appellee.

Before ADAMS, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal presents two principal issues. First, we must decide whether the district court had jurisdiction to enjoin the appellant union from refusing to cross a "stranger picket line."[1] Then, if that question is answered in the negative, we must determine whether a coercive civil contempt decree, based on a violation of the injunction, can survive the invalidation of the underlying order.

### I.

United Steelworkers of America and its Local Union No. 1537 have for many years represented the production and maintenance employees of the Latrobe Steel Company. Local 1537 and Latrobe Steel were signatories to a collective bargaining agreement that contained a broad no-strike clause[2] and an expansive grievance-arbitration provision.[3]

The Steelworkers and another local union have been the certified representatives of the office, clerical and technical employees at the Latrobe plant since 1974. After efforts to negotiate a collective bargaining agreement between the office workers local and Latrobe Steel proved unsuccessful, the office employees established a picket line outside of the Latrobe facility at about 11:00 P.M. on September 4, 1975. As a result of the picket line, the production workers on the midnight shift refused to enter the plant.

Early the next morning, September 5th, Latrobe Steel brought an action in the district court under section 301 of the Labor Management Relations Act of 1947,[4] seeking a temporary restraining order against the refusal of the production employees to cross the picket line. Counsel for the production workers union was not present at the time suit was filed and the preliminary restraining order was requested, and was not notified of the pendency of the action until 12:55 P.M. that day. When counsel for the union arrived, a hearing was held on the afternoon of September 5th. At its conclusion, Judge Ralph Scalera issued a preliminary injunction prohibiting the union and its members from engaging in any work stoppage and directing the parties to the suit to utilize the grievance and arbitration mechanism to resolve any disputes.[5]

After the entry of the preliminary injunction, the officers of Local 1537 proceeded to inform their members that a meeting would be held on September 7th, and urged them to return to work. It appears from the record that the production workers com-

---

1. A "stranger picket line" is a picket line established by a union other than the one against which the injunction is sought.

2. See Basic agreement between Latrobe Steel Company and the United Steelworkers of America §§ I–A, VIII–B reproduced in Joint Appendix (J.A.) pp. 12, 13–14.

3. See id. § VIII, J.A. pp. 13–17.

4. 29 U.S.C. § 185 (1970).

5. The preliminary injunction is reproduced at J.A. pp. 80–81.

plied with the injunction on September 6th and 7th.[6] However, mass picketing by the office workers prevented members of Local 1537 from entering the plant on September 8th and 9th. But even after Latrobe Steel had obtained a state court injunction against the striking office workers and the mass picketing had ceased, the production employees continued to stay off the job and did not return to work until September 18, 1975.

When the production workers did not report for work on September 10th, Latrobe Steel moved the district court to hold Local 1537 and certain of its officers and members in "civil contempt."[7] Following a full hearing the district court ruled that the union was "adjudged in civil contempt."[8] Judge Scalera did not rely on the events of September 8 and 9, noting that it may have been impossible for the union to comply on those days. Instead, he grounded his holding on the refusal of the workers to report on September 11th and 12th, after the mass picketing had terminated and there was no question of the ability of the production workers union to comply with the preliminary injunction.

The district court's contempt order levied a two-part fine on the union. An assessment of $10,000 was imposed, payable to the United States, if the production employees did not report for work at the next shift beginning midnight, September 12th. The court's adjudication also provided that the union would have to pay an additional $10,-000, again to the United States, for each subsequent day the union failed to comply with the preliminary injunction. On October 3, 1975, the district court entered an order staying all proceedings to enforce the contempt judgment until disposition of a motion to vacate the preliminary injunction and any appeals from such disposition.

In an opinion filed on December 10, 1975, the district court denied the union's motion to vacate the preliminary injunction.[9] The present appeal followed.

■■■ This Court has jurisdiction of the appeal from the grant of the preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1). If the contempt adjudication in this case were to be denominated as criminal contempt, it is clear that we would have an independent jurisdictional base over that order.[10] Even if we determine that the contempt decree was civil in nature, however, we reach the same result. This is so because although an adjudication of civil contempt is not ordinarily appealable, it is well established that an appellate court may consider the matter of a civil contempt in connection with an appeal from the underlying preliminary injunction.[11]

After a careful review of the facts and the authorities, we conclude that the preliminary injunction as well as the contempt judgment in this case must be vacated.

## II.

The opinion of the Supreme Court in *Buffalo Forge Co. v. United Steelworkers of*

---

6. *See* J.A. at 96–97, 104, 105.

7. *See id.* at 82–89. Latrobe Steel's motion was captioned "Motion for Adjudication of Civil Contempt" and requested that defendants "be adjudged in civil contempt."

8. Originally, Judge Scalera did not reduce his contempt order to writing. However, upon a later request by the parties, he had the relevant portions of the proceedings transcribed and issued as an order. This is reproduced at J.A. 180–81.

9. *Latrobe Steel Co. v. United Steelworkers*, 405 F.Supp. 787 (W.D.Pa.1975).

10. *See, e. g., Southern Ry. v. Lanham*, 403 F.2d 119 (5th Cir. 1968); *Guilford Nat'l Bank v.*

*Southern Ry.*, 4 Cir., 297 F.2d 921, *cert. denied*, 375 U.S. 985, 84 S.Ct. 518, 11 L.Ed.2d 473 (1964); 9 J. W. Moore, Federal Practice, ¶ 110.-13[4] (1975); 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3917 (1976).

11. *See, e. g., United States v. Spectro Foods Corp.*, 544 F.2d 1175 (3d Cir. 1976); *Cromaglass Corp. v. Ferm*, 500 F.2d 601, 604 (3d Cir. 1974); *Emery Air Freight Corp. v. Local Union 295*, 449 F.2d 586, 590 (2d Cir. 1971), *cert. denied* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1974); *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.*, 86 F.2d 727 (2d Cir. 1936) (per curiam).

*America,*[12] entered after the appeal in this case was filed,[13] significantly altered the backdrop against which the question of the district court's power to enter a preliminary injunction must be considered.

*Buffalo Forge* presented a factual pattern closely analogous to that in the case at hand. A production and maintenance union was a party to a collective bargaining agreement that contained broad no-strike and grievance-arbitration provisions. Office, clerical and technical workers at the plant, after failing to negotiate a satisfactory collective bargaining agreement, established a picket line which the production and maintenance employees refused to cross.[14] The employer then sought an injunction in the district court. Relief was denied, the district court stated, because section 4 of the Norris-LaGuardia Act[15] deprived it of jurisdiction.[16] The Second Circuit affirmed.[17]

On appeal, the Supreme Court held that district courts are not empowered to enjoin a "sympathy" strike pending an arbitrator's decision as to whether the strike was forbidden by a no-strike clause of a collective bargaining agreement. The Supreme Court distinguished *Buffalo Forge* from *Boys Markets, Inc. v. Retail Clerk's Union,*[18] where the Court had held that section 301 of the Labor Management Relations Act carved out a narrow exception to the anti-injunction policy enunciated in section 4 of the Norris-LaGuardia Act. In *Boys Mar-*

*kets* the union, in the face of a collective-bargaining agreement with broad no-strike and grievance-arbitration clauses, had engaged in a work stoppage *over a dispute which both parties were contractually bound to arbitrate.* The Supreme Court had ruled that section 301 authorized the issuance of an injunction because the strike had the purpose and effect of evading an obligation to arbitrate that was specifically set forth in the contract, and consequently deprived the employer of the benefit of his bargain.[19]

The strike in *Buffalo Forge,* however, was not *over a dispute subject to the grievance-arbitration mechanism of the collective bargaining agreement.*[20] Rather, legality of the sympathy strike itself was the controversy that was possibly subject to arbitration. Under no interpretation of the collective-bargaining agreement, stated the Supreme Court, could it possibly be found that the cause of the strike by the production and maintenance workers—the impasse in the office workers' negotiations—was subject to arbitration between the production workers local and Buffalo Forge.[21] And while the sympathy strike may have been in violation of the no-strike provision, this alone did not establish the foundation for the *Boys Markets* exception and thus warrant the issuance of an injunction.

▮▮▮▮ *Buffalo Forge* controls the present case.[22] The work stoppage by the production workers at Latrobe Steel was not over

---

**12.** —— U.S. ——, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

**13.** *Buffalo Forge* was handed down after the submission of the initial briefs in this case. Upon request of the Court, the parties prepared supplemental briefs discussing the impact of *Buffalo Forge* on the action.

**14.** Indeed, the Supreme Court's opinion indicates that the production union ordered its members not to cross the office workers' picket line, *see* —— U.S. at ——, 96 S.Ct. 3141, something that Local 1537 did not do in the present case.

**15.** 29 U.S.C. § 104 (1970).

**16.** *Buffalo Forge Co. v. United Steelworkers of America,* 386 F.Supp. 405 (W.D.N.Y.1974).

**17.** *Buffalo Forge Co. v. United Steelworkers of America,* 517 F.2d 1207 (2d Cir. 1975).

**18.** 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

**19.** *See Buffalo Forge Co. v. United Steelworkers of America,* —— U.S. ——, ——, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

**20.** *See id.*

**21.** *Id.*

**22.** Latrobe Steel argued in its supplemental brief that *Buffalo Forge* is distinguishable on a number of grounds. However, we find none of its contentions to be convincing:

It was argued by Latrobe Steel that the union in this case ignored a pre-strike opportunity to

an arbitrable dispute. Instead, the strike was precipitated by a picket line which was established by members of another union, the office workers, in the course of a controversy with Latrobe by the latter group. Although the legality of the work stoppage by the production workers may have been subject to arbitration, the strike itself did not manifest an attempt to evade the arbitral process. As in *Buffalo Forge,* "There is no necessity . . . such as was found to be the case in *Boys Markets,* to accommodate the policies of the Norris-LaGuardia Act to the requirements of § 301 . . .." [23] Since the work stoppage in this case, as was true in *Buffalo Forge,* was not over an arbitrable dispute, the prohibition of section 4 of the Norris-LaGuardia Act is applicable, and the district court was without jurisdiction to enter a preliminary injunction.[24]

resolve the issue whether it could honor a stranger picket line, a fact not present in *Buffalo Forge.* In anticipation of an office workers' strike, Latrobe Steel, in May 1975, had sent Local 1537 a telegram expressing the opinion that the no-strike clause of the collective bargaining agreement required the production employees to cross an office workers picket line. Latrobe Steel maintained that this placed the onus on the union to seek arbitration of the issue and that Local 1537's failure to do so justified the issuance of an injunction.

This argument is not sufficient to escape the mandate of *Buffalo Forge.* We note that the grievance-arbitration clause of the collective bargaining agreement between Local 1537 and Latrobe Steel permits either party to invoke the mechanism. And since Latrobe Steel was the potentially aggrieved party, the burden was on it to invoke the process, and there is no basis for it to contend that Local 1537 should be held responsible for the lack of arbitration and thus be subject to an anti-strike injunction. Moreover, *Buffalo Forge* states a jurisdictional rule: In the absence of a dispute over an arbitrable issue, a district court lacks jurisdiction to give injunctive relief against a purported breach of a no-strike clause.

Latrobe Steel also asserted that Local 1537 has admitted the illegality of its work stoppage, a factor not present in *Buffalo Forge.* It is true that at the initial September 5th hearing, counsel for Local 1537 acknowledged that the strike was illegal. This appears, however, to have been a product of counsel's lack of time to prepare and inability to consult with her client. Local 1537's later position has consistently

## III.

We now turn to the question whether the district court's order of contempt survives the invalidation of the underlying injunction.

## A.

■ The general rule is that whether a contempt judgment survives the avoidance of an underlying order depends on the nature of the contempt decree. If the contempt is criminal it stands; if it is civil it falls.[25]

■ Although Judge Scalera denominated the contempt order as "civil contempt," the cases admonish us to ascertain independently the nature of the decree instead of treating the district court's mere characterization or label as dispositive.[26] It is well established that the nature of the defend-

been that the refusal to cross the picket line was not illegal.

Finally, Latrobe also insisted that there is an underlying arbitrable dispute in this case. It contended that its demand of May 1975 was, in effect, for work scheduling, over which it had exclusive rights under the collective bargaining agreement. But the acceptance of this contention would leave little substance to the rule of *Buffalo Forge,* since an employer would then be able to transform a negotiating impasse with one union into a work assignment dispute with another by the mere expedient of a telegram.

23. —— U.S. at ——, 96 S.Ct. at 3149.

24. Prior cases in this Circuit had authorized the issuance of injunctions in picketing disputes similar to the one present here. *See, Island Creek Coal Co. v. United Mine Workers,* 507 F.2d 650 (3d Cir.), *cert. denied* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975); *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, Local Union No. 926,* 502 F.2d 321 (3d Cir. (en banc)), *cert. denied* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974). It would appear however, that *Buffalo Forge* has undermined the continuing viability of these cases. *See* —— U.S. at ——, 96 S.Ct. 3141 n. 9.

25. *United States v. United Mine Workers,* 330 U.S. 258, 289–95, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

26. *See, e. g., Lewis v. S. S. Baune,* 534 F.2d 1115 (5th Cir. 1976); *Cromaglass Corp. v. Ferm,* 500 F.2d 601, 604 (3d Cir. 1974); *Southern Ry. v. Lanham,* 403 F.2d 119, 124 (5th Cir.

ant's conduct is not the primary differentiating factor in determining the nature of the contempt. This is so since a single act of contempt may give rise to both criminal and civil sanctions.[27] Rather, the most significant variables are the purpose and character of the sanctions that are imposed against the contemnor.[28]

The purpose of criminal contempt is to vindicate the authority of the court.[29] Criminal contempt seeks to punish past acts of disobedience and may be maintained only with the court's approval.[30] Its

proceedings are separate from the actions which spawned them.[31] If a criminal contempt action develops from a civil proceeding, it bears a separate caption apart from the civil suit.[32] And the penalties arising out of adjudications of criminal contempt are generally an absolute fine of a specific amount or a determinate period of confinement.[33]

On the other hand, the objective of a civil contempt decree is to benefit the complainant.[34] Civil contempt proceedings are instituted primarily on the motion of

1968). This is a preferable practice because, in the face of a party's defiance of a court order, a trial judge may not necessarily be responsive to the nice distinctions between the variety of contempt sanctions.

27. *See, e. g., United States v. United Mine Workers,* 330 U.S. 258, 298–99, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *Shakman v. Democratic Organization of Cook County,* 533 F.2d 344 (7th Cir. 1976); 3 C. Wright Federal Practice & Procedure § 704 at 157 (1969).

The Supreme Court in *Gompers* suggested that one test which might generally reveal the nature of contempt penalties was whether the contemptuous conduct was "refusing to do an act commanded" or "doing an act prohibited." 221 U.S. at 443, 31 S.Ct. 492. The former would be civil contempts, the latter criminal contempts. We agree, however, with the Seventh Circuit's statements in *Shakman* that this was not intended to be a dispositive test, and that it is a less than adequate yardstick. *See* 533 F.2d at 349 n. 7. Indeed, the present case provides an excellent example of how those categories could be manipulated, since Local 1537's actions could be classified as either the refusal to perform a commanded act, *i. e.,* return to work, or as the commission of proscribed conduct, *i. e.,* continuing to strike.

28. *See, e. g., Penfield Co. v. SEC,* 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *United States v. Spectro Foods Corp.,* 544 F.2d at 1175 (3d Cir. 1976); *Shakman v. Democratic Organization of Cook County,* 533 F.2d 344, 348–49 (7th Cir. 1976); *Southern Railway Co. v. Lanham,* 403 F.2d 119, 124 (5th Cir. 1968); 3 C. Wright, Federal Practice and Procedure § 704 at 159 (1969).

29. *See, e. g., United States v. United Mine Workers,* 330 U.S. 258, 302, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Gompers v. Bucks Stove &*

*Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *Shakman v. Democratic Org. of Cook Cty.,* 533 F.2d 344 (7th Cir. 1976); *Cromaglass Corp. v. Ferm,* 500 F.2d 601, 603 (3d Cir. 1974); 3 C. Wright, Federal Practice and Procedure § 704 at 159.

30. *See, e. g., Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 445–46, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *Kienle v. Jewel Tea Co.,* 222 F.2d 98 (7th Cir. 1955); Dobbs, Contempt of Court: A Survey, 56 Corn.L.Rev. 183, 239 (1971).

31. *See Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 444–45, 446, 31 S.Ct. 492, 55 L.Ed. 797 (1911).

32. *See id.* at 446, 31 S.Ct. 492.

33. *See* Dobbs, *supra* note 30, at 236, 267. Criminal contempt actions are also distinguished by stringent procedural safeguards which are required by the Constitution, *see* *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797 (1911); statute, *see* 18 U.S.C. § 402 (1970) (jury trial); and rule, *see* F.R. Crim.P. 42(b). But it would seem that the procedures to which an alleged contemnor is entitled is a function of the nature of the contempt judgment being sought, something which is ascertained by the factors we have previously discussed.

34. *See, e. g., United States v. United Mine Workers,* 330 U.S. 258, 295, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492 (1911); *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 910 (3d Cir. 1975); *In re Nevitt,* 117 F. 448, 458 (8th Cir. 1902); 3 C. Wright, Federal Practice and Procedure § 704 at 159 (1969).

the plaintiff and are part of the underlying action.[35]

■ While the *Gompers* case speaks in terms of a dichotomy between criminal and civil contempt, civil contempt itself may be divisible into two sub-categories which benefit the aggrieved party in distinctive ways.[36] Remedial or compensatory actions are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience.[37] Coercive sanctions, in contrast, look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order or by assuring that a potentially contumacious party adheres to an injunction by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience.[38]

Trial judges have a variety of weapons with which they can achieve these ends. They may impose an indeterminate period of confinement which may be brought to an end only by the contemnor's ultimate adherence to the court order.[39] Alternatively, the court may levy a fine of a specified amount for past refusal to conform to the injunction, conditioned, however, on the defendant's continued failure to obey. The court may also specify that a disobedient party will be fined a certain amount for each day of non-compliance. Indeed, the methods that may be employed to coerce a recalcitrant party into compliance with an injunction are many and varied.[40]

■ After reviewing the elements of Judge Scalera's order, we conclude that it was in the nature of a coercive civil contempt. While there are some indications that the district judge may have been seeking to vindicate the authority and dignity of the court,[41] and although the fines ultimately imposed were to be paid to the United States, a factor which frequently denotes a criminal contempt, the principal thrust of the decree was to benefit Latrobe Steel by providing disincentives for the union to continue its defiance of the court order.

Specifically, although the first $10,000 fine was predicated on past acts of contempt—the failure of the production employees to report to work on September 10th and 11th—the order provided that the fine would not be executed if the union immediately expurgated itself of the contempt. Thus, the principal beneficiary of the union's compliance would be Latrobe Steel and not the court or the government.

35. *See, e. g., Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441–42, 446, 31 S.Ct. 492, 55 L.Ed. 797 (1911).

36. *See Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir. 1976).

37. *See Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir. 1976); *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 910 (3d Cir. 1975).

38. *See, e. g., Shillitani v. United States,* 384 U.S. 364, 368–69, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441–42, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *United States v. Spectro Foods Corp.,* 544 F.2d 1175 (3d Cir. 1976).

The concurring opinion might be read to indicate that coercive civil contempts were not contemplated by the Supreme Court in *United States v. United Mine Workers* and in the earlier authorities relied upon by that case. As an historical matter, however, coercive contempt sanctions date at least from the turn of the century. They were carefully discussed in three of the leading American cases on contempts: *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *Doyle v. London Guarantee Co.,* 204 U.S. 599, 27 S.Ct. 313, 51 L.Ed. 641 (1907); and *In re Nevitt,* 117 F. 448 (8th Cir. 1902), all of which were cited in *United Mine Workers.* And, indeed, several of the opinions in *United Mine Workers* explicitly recognize the existence of coercive civil contempt sanctions. *See* 330 U.S. at 304–05, 67 S.Ct. 677 (majority opinion); *id.* at 330–32, 67 S.Ct. 677 (opinion of Black and Douglas, JJ.); *id.* at 379–381, 67 S.Ct. 677 (Rutledge, J., dissenting).

39. See *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911); Dobbs, *supra* note 30, at 235–36, 237.

40. See Dobbs, *supra* note 30, at 267.

41. Upon issuing the injunction, for example, Judge Scalera directed Latrobe Steel to bring contempt proceedings "if there is one violation of the injunction." J.A. at 61.

The second aspect of the judgment is even more clearly coercive in nature, since the additional fine of $10,000 per day could be triggered only by future intransigence on the part of the union. Such intransigence would harm Latrobe, and the prospects of a fine of $10,000 per day would chill the chance of disobedience and thus redound to the benefit of Latrobe.

Our conclusion that the contempt here was not criminal in nature, but rather civil and coercive, is buttressed by the fact that the order and the proceedings below display other badges of civil rather than criminal contempt. The contempt order was bottomed on the motion of Latrobe Steel, not on the motion of the court, and was closely related to the underlying civil lawsuit. Also, it was captioned "Latrobe Steel Co. v. United Steelworkers of America, et al.," not "In re United Steelworkers of America, et al.," or "United States v. United Steelworkers of America." The latter citation would have been utilized for a criminal contempt action.

### B.

The remaining issue, whether a civil contempt order that is coercive in nature falls with the underlying injunction, is one which has received scant judicial consideration.[42] The paucity of analysis of this problem, which is critical to the disposition of the present case, is particularly surprising, given the wealth of precedent on the effect generally of the invalidation of a prior injunction on subsequent criminal and compensatory civil contempts.

With regard to criminal contempt, the Supreme Court's opinions in *Walker v. Birmingham* [43] and *United States v. United Mine Workers* [44] clearly hold that a criminal contempt judgment does survive the voiding of an injunction.[45] *United Mine Workers* also teaches that a compensatory civil contempt judgment cannot withstand the reversal of an injunction,[46] a doctrine which has been reiterated by this Court in *Universal Athletic Sales Co. v. Salkeld.*[47]

Although the cases do not fully explicate the reasoning behind the general principle that compensatory civil contempt does not survive the abrogation of the underlying decree, the precept is, in our opinion, a sound one. A compensatory contempt proceeding is similar in several particulars to an ordinary damage action, since

---

**42.** The parties to this action have cited three cases which arguably considered this point, but in none of the cases did the court explicitly rule on this issue. *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1236 (5th Cir. 1975), did involve an injunction later determined to be invalid and a coercive contempt decree—a conditional fine—but in holding that the contempt order fell with the underlying injunction, the court did not specifically address the issue of coercive contempt. Instead, it made a general reference to civil contempt. *Inland Steel Co. v. Local Union No. 1545,* 505 F.2d 293, 296–97 (7th Cir. 1974) and *Brotherhood of Locomotive Engineers and Firemen v. Bangor & Aroostook RR.,* 127 U.S.App.D.C. 23, 380 F.2d 570, 583, 587 n. 37, *cert. denied,* 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967), do expressly discuss the impact of the reversal of an injunction on a coercive contempt judgment. Both of these discussions, however, are dicta, since the injunctions involved in those cases were found to be valid, obviating the necessity for a decision regarding the effect of invalidity of the prior injunctive order on the subsequent contempts. Moreover, as indicated below, we find the analyses in these two opinions to be unconvincing, since they do not

reflect fully the teachings of *United States v. United Mine Workers*, 330 U.S. 258, 294–95, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

*United States v. Spectro Foods Corp.,* 544 F.2d 1175 (3d Cir. 1976), recently decided by this Court, was not discussed in the briefs. It held that a coercive civil contempt judgment does not survive the invalidation of an underlying injunctive order.

**43.** 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

**44.** 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

**45.** The *United Mine Workers* court expressly stated that "violations of an order are punishable as criminal contempt even though the order is set aside on appeal . . . ." 330 U.S. at 294, 67 S.Ct. at 696.

**46.** 330 U.S. at 294–95, 67 S.Ct. at 696. ("The right to remedial relief falls with an injunction which events prove was erroneously issued.")

**47.** 511 F.2d 904, 910 (3d Cir. 1975).

it is in essence an action between private parties,[48] with rights created by the injunctive order rather than by a statute or the common law. The invalidation of an injunction in such a setting is equivalent to a holding that the plaintiff never had a legally cognizable interest which the defendant was obliged to respect, a conclusion which should be distinguished from the nearly unconditional duty of obedience owed by a defendant to a court. The *United Mine Workers'* doctrine thus recognizes that a private party should not profit as a result of an order to which a court determines, in retrospect, he was never entitled.[49]

Dicta in *Bangor and Aroostook Railroad* and *Inland Steel,*[50] however, suggest that a coercive fine, as distinguished from a compensatory award, straddles to some degree the line between criminal and compensatory civil contempts. Several factors would appear to support the thesis of these two courts. In the case of a coercive fine, no money passes to the complainant as damages, as contrasted with the situation in remedial civil contempt; instead, it is paid into the court or the public treasury. And at the exaction stage of coercive contempt—the point where the total fine is tallied and executed—the proceeding does resemble criminal contempt, since at that juncture the court is ordering a definite sum to be paid into the public fisc on account of past contumacy. Compelling payment of this fine would thus, in some measure, vindicate the integrity of the judicial process.

Despite these arguments, it would appear that the analysis inherent in the dicta in *Bangor and Aroostook Railroad* and in *Inland Steel* is questionable. While coercive fines have some tendency to vindicate the court's authority, as well as to assist the plaintiff, *Gompers* noted that all contempt sanctions are to some degree double edged,[51] assisting the plaintiff to some extent but also vindicating the court. Moreover, the logic supporting the principle enunciated in *United Mine Workers* and *Salkeld,* that a civil contempt is akin to a private action for damages, appears to be equally applicable in the context of coercive contempt. This would seem to be the case since coercive contempt proceedings are brought by litigants and are essentially private disputes between the parties, and not between the court and an individual, as is the case with criminal contempts.[52]

---

**48.** *See, e. g., Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 444–45, 31 S.Ct. 492, 55 L.Ed. 797 (1911).

**49.** This consideration was well stated by the Second Circuit in *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.,* 86 F.2d 727 (2d Cir. 1936) (per curiam):

> It is true that the reversal of the decree does not retroactively obliterate the past existence of the violation; yet on the other hand it does more than destroy the future sanction of the decree. It adjudges that it never should have passed; that the right which it affected to create was no right at all. To let the liability stand for past contumacy would be to give the plaintiff a remedy not for a right but for a wrong, which the law should not do.

Judge Weis' opinion for this Court in *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 910 (3d Cir. 1975) expressed similar reasoning.

> [A civil contempt proceeding] is *not* designed to vindicate the court's authority but to recompense one of the private parties for loss caused by the failure of the other to observe the court's order. . . . A vacation of the injunction establishes that there was no basis for any claim for loss based on the invalid court order.

*See also, United States v. United Mine Workers,* 330 U.S. 258, 294–95, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 828 (5th Cir. 1976).

There is some indication, although it is far from clear, that the district court had intended to utilize some of the fine for the benefit of Latrobe Steel.

**50.** *See* note 42, *supra.*

**51.** 221 U.S. at 441, 443, 31 S.Ct. 492, 55 L.Ed. 797.

**52.** In *Doyle v. London Guarantee Co.,* 204 U.S. 599, 607, 27 S.Ct. 313, 315, 51 L.Ed. 641 (1907), a case relied upon in *Gompers,* the Supreme Court said of a contempt action imposing a coercive fine: "The proceeding is against a party, the compliance with the order avoids the punishment, and there is nothing in the nature of a criminal suit or judgment imposed for public purposes upon a defendant in a criminal proceeding." *See also In re Nevitt,* 117 F. 448, 458 (8th Cir. 1902).

Given this analysis, the reasoning implicit in *United Mine Workers* requires that coercive contempt be treated in the same fashion as compensatory contempt.[53] In coercive contempt, as with remedial contempt, the reversal of the underlying injunction indicates that the complainant never had a valid right which was enforceable against the defendant. Just as a person is not entitled to reap a monetary benefit in such circumstances, so, too, should he be unable to insist upon the exaction of coercive sanctions to finalize a process initiated by himself for his own benefit.[53a]

We are aware that some might maintain that when a person willfully violates a court order, any court order, the invalidation of the decree should not disturb the imposition of contempt sanctions upon a disobedient party. Respect for the law, the argument goes, demands no less. But it is also true that one of the fundamental postulates of our legal system is that a decree of a court without jurisdiction is void, and that it might well be anomalous to hold a party accountable for violation of such a void order.[54]

These are both weighty considerations, but there does not appear to be a need, at least in a situation such as that presented here, to express an absolute preference for one over the other. Thus, our task, as often the case in litigation, is to reconcile two legal principles, in order to prevent either from destroying the other. Here, the importance of each of the principles can be acknowledged by recognizing that a court may uphold respect for law through the utilization of the criminal contempt process, while preventing litigants from benefiting from void court orders through the medium of either remedial or coercive civil contempt.

Furthermore, it must be kept in mind that the survival of even a criminal contempt sanction, despite the invalidation of an underlying order, is an exception to the fundamental rule that when a court has no jurisdiction its orders and decrees have no effect. To expand the exception applicable to criminal contempts to encompass a civil contempt order, even when such order is coercive in nature would create a further inroad into the basic precept regarding jurisdiction. Since a court may, at its election, provide for the survival of a contempt by affording the party the protections surrounding a criminal contempt, there would

---

**53.** We agree with the statements in the concurring opinion that the discussions in *United Mine Workers* and *Salkeld* of the viability of contempt decrees in the face of the avoidance of an underlying injunction, as well as the cases they rely upon, explicitly address only compensatory civil contempt. See concurring opinion at 1349. Our suggestion, however, is not that *United Mine Workers* directly disposes of the question before us, but that its conceptual underpinnings would appear to be equally applicable in the present context. We also note the assertion in the concurring opinion that *United Mine Workers* distinguished between "contempt orders which are designed to safeguard the public interest," and those which are "entered to assist or recompense a private litigant," concurring opinion at 1349. There appears to be no textual foundation in the Supreme Court's opinion to support this proposition. At no point in the Court's discussion of the effect of the invalidation of an injunction upon an adjudication of contempt does the Court make reference to civil contempts designed to protect the public interest. All of its references are to "criminal contempt." *See* 330 U.S. at 294–95, 67 S.Ct. 677.

It should also be mentioned that the Supreme Court's use of the term "remedial" in describing those contempts which cannot survive the invalidation of an underlying order, do not necessarily exclude coercive civil contempts. Several cases refer to coercive sanctions as "remedial" in nature. For example, the *Gompers* case, the seminal opinion on the distinctions between criminal and civil contempts, stated that coercive imprisonments are "intended to be *remedial* by coercing the defendant to do what he had refused to do." 221 U.S. at 442, 31 S.Ct. at 498 (emphasis added). It is not suggested, however, that this is at all dispositive of the problem before us.

**53a.** We note that we are not presented with a case in which the coercive fine has been paid to the Clerk of the Court and deposited in the United States Treasury. In such an instance the controversy regarding the payment of such sum may become moot because the only method to obtain a refund of the executed fine would be through an Act of Congress.

**54.** *See, e. g.,* Cox, The Void Order and The Duty to Obey, 18 U.Chi.L.Rev. 86 (1948).

appear to be no sound justification for such an extension, at least in the context of this case.[55]

 In any event, this Court's very recent holding in *Spectro Foods,* that coercive contempt cannot survive the overturning of the underlying injunctive order, is applicable and we are required to follow it.

Even if we were to conclude that the contempt order sought was criminal in nature, the judgment of the district court would have to be vacated nonetheless. This is so since it does not appear that the union was afforded any of the procedures required in criminal contempt situations by the applicable rules[56] and statutes,[57] or by the constitutional safeguards mandated by *Gompers* and *Bloom.*[58]

**55.** The concurring opinion expresses the fear that the limitations on criminal contempt penalties presently included in 18 U.S.C. § 402 could make that weapon ineffective in a class of cases when an overarching public interest is subject to an immediate threat. Since no public interest was adverted to in the record here, and the district court in no way predicated the civil contempt on the existence of any such public interest consideration, this case would not appear to raise the viability of the rule suggested by the concurring opinion. *Cf. Doyle v. London Guarantee Co.,* note 52 *supra.*

Moreover, the present action is not one where the effectiveness of criminal contempt sanctions could arguably be dulled by the limits of section 402. The $1000 ceiling on fines applies only to natural persons, and not to an unincorporated association such as a union. Thus, the district judge could impose whatever criminal fine he deemed appropriate, within constitutional limits. Indeed, the *United Mine Workers'* court itself approved the imposition of a substantial criminal contempt fine upon a labor organization.

It is also probable that the bulk of cases in which the public interest is implicated would involve unincorporated associations and corporations, entities that are not subject to limitations on fines contained in section 402, rather than individuals.

Further, if the limits contained in section 402 are indeed a hindrance to the ability of the district courts to ensure respect for their orders, the preferable corrective action would be for Congress to revise the section 402 ceilings, rather than for us to announce a new exception

## IV.

Accordingly, the injunction and the order of contempt will be vacated and the cause remanded for proceedings consistent with this opinion.

GARTH, Circuit Judge (concurring):

While I agree with the majority holding that *Buffalo Forge Co. v. United Steelworkers,* —— U.S. ——, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), controls the disposition of the injunction entered by the district court and that we must therefore reverse that court's order, I am severely troubled by the doctrine enunciated by the majority that every coercive civil contempt order must fall if the underlying order upon which it is predicated is subsequently determined to be invalid.

to the teaching that the decrees of a court without jurisdiction are a nullity. The congressional path is also more desirable since permitting coercive contempts to survive the invalidation of an underlying injunctive decree would present the possibility that a person could be confined indefinitely for violation of a void court order, something that could raise a serious constitutional problem.

**56.** Rule 42(b) of the Federal Rules of Criminal Procedure requires that criminal contempts save for those committed in the presence of the court, must be prosecuted on notice, and that the notice must describe the criminal contempt "as such." Local 1537 was not provided with such notice. And at no point in the proceedings was there an explicit reference to criminal contempt.

**57.** The union was not given the opportunity to demand a jury trial, even though 18 U.S.C. § 3692 (1970) grants such a right "in all cases of contempt arising under the laws of the United States governing the issuance of injunctions or restraining orders in any case involving or growing out of a labor dispute."

**58.** In *Duncan v. Louisiana,* 391 U.S. 145, 161–62, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Supreme Court indicated that a criminal defendant had a right to a jury trial when the government sought to impose upon him a fine in excess of $500. Insofar as the fine inflicted upon Local 1537 exceeded this sum, it was entitled to a jury trial under the principles of *Duncan* and *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).

Under normal circumstances my views would accordingly be expressed in an opinion which would concur in part with, and dissent in part from, the majority opinion. However, just prior to the filing of this opinion by the panel majority, another panel of this Court filed *United States v. Spectro Foods,* 544 F.2d 1175 (3d Cir. 1976). I was not a member of that panel and hence could not express my opinion as to the survival of a coercive civil contempt order after the underlying injunctive decree had been reversed.

I concede regretfully that upon the filing of *Spectro Foods* the result in this case was foreordained and that I am bound by *Spectro Foods* as the law of this Circuit. However, I feel it necessary to explain why I believe the result reached in *Spectro Foods* and therefore reached here as concerns coercive civil contempt is a bad one.

I know of no direct authority which supports the holding of *Spectro Foods* with respect to coercive civil contempt. To the extent that that holding was based upon *United States v. United Mine Workers,* 330 U.S. 258, 294–95, 67 S.Ct. 677, 91 L.Ed. 884 (1947), and the cases upon which *UMW* relied, I believe that those precedents have been misread and do not support that proposition. The reasoning in *UMW* upon which *Spectro Foods* relied did not draw a simple distinction between "criminal" contempt, which survives invalidation of the underlying order, and "civil" contempt, which does not survive. Rather, *UMW* distinguished between, on the one hand, contempt orders which are designed to safeguard the public interest and which survive an invalid underlying order and, on the other hand, contempt orders which are entered to assist or recompense a private litigant and which do not so survive.[1]

The relevant passage in *UMW* stated:

*It does not follow,* of course, that simply because a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal, *that the plaintiff in the action may profit by way of a fine* imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order. The right to remedial relief falls with an injunction which events prove was erroneously issued, *Worden v. Searls,* [121 U.S. 14, 7 S.Ct. 814, 30 L.Ed. 853 (1886)]; *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.,* 86 F.2d 727 (1936); *S. Anargyros v. Anargyros & Co.,* 9 Cir., 191 F. 208 (1911) . . . . (Emphasis added.)

*Id.* at 294–95, 67 S.Ct. at 696. *Spectro Foods* and therefore *Latrobe,* read the key words "remedial relief" to include all varieties of civil contempt orders. But the text of *UMW* suggests that what the Court truly meant by "remedial relief" was relief afforded by orders under which "the plaintiff in the action may profit by way of a fine." The three cases cited by the Court make this plain.

In the first case cited by *UMW* on this point, *Worden v. Searls,* 121 U.S. 14, 7 S.Ct. 814, 30 L.Ed. 853 (1886), a contempt order was held not to survive invalidation of the underlying order because "though the proceedings were nominally those of contempt, they were really proceedings to award damages to the plaintiff, and to reimburse to him his expenses . . . ." *Id.* at 26, 7 S.Ct. at 820.

In the second case cited by *UMW, S. Anargyros v. Anargyros & Co.,* 191 F. 208 (C.C.N.D.Cal.1911), the court stated:

If . . . the proceeding is to be regarded as one *instituted for the relief and benefit of the complainant,* and so purely civil and remedial in character, the rever-

---

1. Note 53 of the majority opinion may be misleading in that it would appear from that footnote that I was quoting from *United Mineworkers* in distinguishing between the public interest and private interests. The textual support for the distinction found in *United Mineworkers* is the paragraph reproduced in the above text. I agree that to the extent that the subject of *United Mineworkers* involved only criminal contempts it does not decide the issue on which the majority and I divide. It is precisely because there is no Supreme Court authority resolving this issue that I have found it necessary to comment on *Spectro's* holding, which is followed by the majority here.

sal of the order granting the injunction which the contemnors are charged with having violated leaves no basis upon which to rest a judgment for a *compensatory fine.* (Emphasis added.)

*Id.* at 209. The contempt in that case was vacated because the fine was compensatory.

Finally, the third case cited by *UMW, Salvage Process Corp. v. Acme Tank Cleaning Process Corp.,* 86 F.2d 727 (2d Cir. 1936), also involved a compensatory fine payable to the plaintiff. This fine fell with the underlying order because "[t]o let the liability stand for past contumacy would be *to give the plaintiff a remedy* not for a right but for a wrong, which the law should not do." (Emphasis added.) *Id.*

The Court's opinion in *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904 (3d Cir. 1975), which *Spectro Foods* cited along with *UMW,* also involved a compensatory fine.

In summary, *UMW,* the cases cited in *UMW* and *Universal Athletic Sales* all concerned compensatory civil contempt. Coercive civil contempt orders—which impose prospective, conditional fines payable to the *government* and which are designed to safeguard the public interest—apparently were not even contemplated in *UMW* and the earlier cases on which *UMW* relied.

The District of Columbia Circuit considered the effect of *UMW* on coercive civil contempt orders in *Brotherhood of Locomotive Firemen and Engineers v. Bangor & Aroostook Railway,* 127 U.S.App.D.C. 23, 380 F.2d 570, 583 (1967), and I find that court's reasoning, which follows, much more persuasive than the analysis in *Spectro Foods* and in the majority opinion in this case:

> It would appear to be fallacious to hold that the efficacy of coercive civil fines is to be governed by the compensatory fine rationale of *Mine Workers,* which allows alleged contemnors to challenge the propriety of the underlying order in defense of their otherwise contemptuous disobedience of that order. Certainly, a prospective, coercive fine, short of an absolutely

imposed punitive sanction but beyond the remedial function of a compensatory fine, will serve to preserve the court's "power to order maintenance of a *status quo,*" only to the degree that litigants are prevented from pre-judging the validity of that court's orders. Rather, as is true of punitive fines under *Mine Workers,* it would seem that prospective, coercive fines should be enforceable despite a subsequent determination by the District Court, or on appeal, that the disregarded order was in fact beyond the ordering court's jurisdiction. (Footnote omitted.)

*See also Inland Steel Co. v. Local Union No. 1545, UMW,* 505 F.2d 203, 296–97 (7th Cir. 1974).

In my view, *Spectro Foods* not only misreads the relevant precedents, but it also seriously undermines the authority of the district courts to coerce compliance with their orders. It dilutes the sanction of coercive civil contempt by permitting a contemnor to gamble that the underlying order will subsequently be invalidated. In many instances in which the public interest is paramount and immediate cessation of proscribed activity is essential, the holding of *Spectro Foods* and now *Latrobe* may result in a completely inadequate remedy.

I see no reason why, if a criminal contempt can survive an invalid underlying order, the same effect should not be given to a coercive civil contempt order. I would opt for the following principle: In those cases in which a district court judge has made an express finding that the action compelled was required in the public interest, a coercive civil contempt fine should survive the subsequent invalidation of the underlying order. Indeed, as I read the majority opinion, it leaves open the possibility that this principle may some day become the law in this Circuit. Thus, the majority's holding does not reach cases in which the district court predicated the civil contempt on the presence of "an overarching public interest." Majority Opinion at 1348 n. 55. In my view, the appropriate disposition of this case would require a remand to

the district court with instructions to determine the presence of an "overarching public interest." Such an inquiry might require the record to be supplemented by additional testimony and evidence, inasmuch as the district court having understandably regarded the primary issue as being governed by *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, Local Union No. 926,* 502 F.2d 321 (3d Cir. 1974) (en banc), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974), had no reason to consider the concepts discussed here.

No reason has been given in either *Spectro Foods* or *Latrobe* as to why we should deprive the district courts of the complete and effective utilization of a perfectly valid and necessary sanction.[2] Criminal contempts, which are limited in the case of a natural person to a fine of $1,000 and imprisonment for six months (18 U.S.C. § 402), can not compel compliance and, in certain circumstances where the public interest is predominant, just cannot supply the required remedy. While I am obliged to bow to this Court's expression of the law as found in *Spectro Foods* and now *Latrobe,* I do so with the fear that the cutback in civil contempt effectiveness as now reflected in the holdings in these cases will cause untold difficulties in situations in which vital public interests require immediate protection.

2. *See* Matter of Grand Jury Impaneled Jan. 21, 1975, 529 F.2d 543, 550–51 (3d Cir. 1976).