Terri Lee HALDERMAN, a retarded citizen, by her mother and guardian, Winifred Halderman; et al., Plaintiffs-Intervenors,

v.

PENNHURST STATE SCHOOL & HOSPITAL, et al.

Appeal of Helen O'BANNON and the Department of Public Welfare.

No. 81–2381.

United States Court of Appeals, Third Circuit.

Hearing En Banc

Argued Nov. 23, 1981.

Decided Feb. 26, 1982.

Rehearing Denied March 23, 1982.

LeRoy S. Zimmerman, Atty. Gen., Allen C. Warshaw, Deputy Atty. Gen., Chief, Special Litigation (argued), Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., for appellants.

David Ferleger, Philadelphia, Pa., Penelope A. Boyd (argued), Philadelphia, Pa., for Terri Lee Halderman, et al.

Thomas K. Gilhool (argued), Frank J. Laski, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for Pennsylvania Ass'n for Retarded Citizens, et al.

Alexander Ewing, Jr., Asst. U. S. Atty., Philadelphia, Pa., Louise A. Lerner, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., for United States.

Before SEITZ, Chief Judge, and ALDISERT, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge, with whom ALDISERT, WEIS, HIGGINBOTHAM, and SLOVITER, Circuit Judges join:

The Honorable Helen O'Bannon, Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania, and that Department, appeal from an August 25, 1981, order of the District Court, 533 F.Supp. 631, holding them in civil contempt, after a hearing, for failure to comply with the terms of the court's orders of June 4, 1981, and July 14, 1981. Those orders directed that the Commonwealth of Pennsylvania pay into the Registry of the District Court estimated costs for the operation of the Office of Special Master created under the terms of prior orders in this protracted lawsuit. The plaintiffs have moved to dismiss the appeal from the contempt order for want of an appealable order. We conclude that we have appellate jurisdiction, and we affirm.

I

This civil contempt proceeding arises out of a class action granting injunctive relief against the fact or conditions of confinement in Pennhurst State School and Hospital (Pennhurst) of persons suffering mental retardation. The action was commenced in May of 1974 by Terri Lee Halderman, a minor resident of Pennhurst. A motion by the United States to intervene as a plaintiff was granted in January, 1975, and the Pennsylvania Association for Retarded Citizens (PARC) successfully moved to intervene thereafter. The Commonwealth defendants are the Department of Public Welfare, the Secretary of the Department, and a number of state officials having responsibility for the habilitation of the mentally retarded in Pennsylvania and for the operation of Pennhurst. Additional defendants, not involved in the contempt proceedings, are five counties of southeastern Pennsylvania which, under Pennsylvania law, share responsibility with the Commonwealth for the habilitation of the mentally retarded. After extensive pretrial discovery and a lengthy trial, the District Court in December 1977 made findings of fact and conclu-

sions of law holding that the rights of class members secured to them by the Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa.Stat.Ann. tit. 50, §§ 4101–4704 (Purdon 1969) (MH/MR Act of 1966), by several federal statutes, and by the federal constitution were being violated.[1] When the parties were unable to agree on an order which would remedy the continuing violations of law which the district court found, on March 17, 1978 the Court issued a permanent injunction ordering that Pennhurst eventually be closed and that suitable community living arrangements and necessary support services be provided for its residents. Particularly relevant to the contempt proceedings is the provision in the March 17, 1978 order for the appointment of a Special Master to supervise the planning and implementation of arrangements for placing Pennhurst residents elsewhere, and for the operation of Pennhurst until such placements were accomplished. Paragraph 8 of the District Court's March 17, 1978 order provided that

[t]he Master shall engage such staff of his or her own as he or she finds necessary, subject to the approval of the Court. The Master and his or her staff shall be compensated by the commonwealth defendants at a rate to be set by the court; the expenses of the mastership to be borne by the commonwealth defendants.[2]

All defendants appealed from the March 17, 1978 Order. An application to stay that order was denied by the District Court,[3] and a panel of this Court denied a stay pending appeal. Before this Court the Commonwealth defendants opposed the March 17, 1978 order in all respects, but in particular because (1) the prospective relief which was ordered required the expenditure of Commonwealth funds, and (2) the appointment of a Special Master was improper. This Court expressly rejected both of those objections.[4] For the most part we affirmed

the District Court's order. We did, however, conclude that in ordering that Pennhurst be closed and in prohibiting all future admissions to that institution, the judgment went beyond what the law required. Instead, we held individual determinations of need were required for each present resident or future admittee.

[I]nstitutionalization is a disfavored approach to habilitation. Only where the court or the Master finds that an improved Pennhurst is the only appropriate place for individual patients should it be used. For all other patients, CLAs must be provided. We caution both the trial court and the Master that before ordering transfers to CLAs they must have assurances that the sanitary, staffing, and program deficiencies which were found at Pennhurst are not duplicated on a smaller scale in the CLAs.[5]

Thus both the March 17, 1978 judgment and our opinion and judgment affirming and modifying it, contemplated a significant ongoing role for the Special Master both with respect to the internal conditions at Pennhurst and with respect to returning Pennhurst inmates to a more normal environment. Even those judges who dissented from the provisions of the judgment requiring steps toward normalization of inmates rather than perpetual confinement made no objection to the use of a Special Master to bring about an internal improvement of the intolerable conditions at Pennhurst. The judgment on appeal therefore made no change in the provision in paragraph 8 of the District Court's March 17, 1978 judgment ordering the Commonwealth to pay the expenses of the Master. In that respect this Court was unanimous.

The March 17, 1978 order in relevant respects has been in place and unstayed at all times since. It was the clear understanding of the Court and all parties that

1. The District Court opinion is reported at 446 F.Supp. 1295 (E.D.Pa.1977).

2. *Id.* at 1327.

3. *Halderman v. Pennhurst State School & Hospital*, 451 F.Supp. 233 (E.D.Pa.1978).

4. *Halderman v. Pennhurst State School & Hospital*, 612 F.2d 84, 109, 111 (3d Cir. 1979).

5. *Id.* at 116 (footnote omitted).

the costs of the Special Master's office be borne by the Commonwealth. This clear understanding is confirmed by the fact that beginning in 1978, each of the District Court's periodic orders for payment of the cost of the Master was directed to the Commonwealth as such. In compliance with the mandate of this Court, the scope of the Master's duties was modified by a District Court order of April 24, 1980, which established an impartial hearing procedure and appointed a Hearing Master to provide an individual hearing for Pennhurst residents who desired to live in the community. No appeal was taken from the April 24, 1980 order, which modified the March 17, 1978 injunction. After the April 24, 1980 modification, the Court continued the prior practice of issuing periodic payment orders to the Commonwealth. No appeal was ever taken by the Commonwealth from any of these periodic payment orders. They all were honored by payment until the order of June 4, 1981.

On June 10, 1980 the Supreme Court granted certiorari from the prior judgment of this Court.[6] Prior thereto no stay of our mandate had been sought. Thus the modification of the March 17, 1978 judgment by the April 24, 1980 District Court order establishing a Hearing Master was plainly within the District Court's jurisdiction and complied with our mandate. On June 30, 1980 the Supreme Court entered a partial stay of the judgment of the Court of Appeals "to the extent that the judgment mandates the movement of residents of the Pennhurst facility to 'appropriate community living arrangements'" but denied a stay in all other respects.[7] Among the requests to the Supreme Court for a stay which were considered and denied were several addressed to the operation of the Office of

Special Master.[8] When advised of the Supreme Court's action on the application for a stay, the District Court on July 14, 1980 further modified the injunction only to the extent of directing the Hearing Master, provided for in the April 24, 1980 order, to determine whether transfers out of Pennhurst were voluntary. All involuntary transfers to community living arrangements were terminated pending a further ruling by the Supreme Court.[9] No appeal was taken from this order, which enlarged the role of the Masters slightly.[10] After entry of the July 14, 1980 order, the Commonwealth continued to make payments in compliance with the Court's periodic payment orders, until June of 1981.

On April 20, 1981 the Supreme Court reversed the judgment of this Court and remanded with a direction for further proceedings in conformity with the opinion of the Court.[11] The Supreme Court's judgment did not affect the District Court's March 17, 1978 judgment as modified by the April 24, 1980 and July 14, 1980 orders. Insofar as those orders deal with the expense of the Special Master's office, those orders have been in effect at all relevant times. Moreover, the Court's periodic payment orders of June 4, 1981 directing the Commonwealth to pay $67,746.08 have not been appealed by anyone, and the Commonwealth as such has not appealed the July 14, 1981 periodic payment orders. In the opinion on remand from the Supreme Court, filed simultaneously herewith, we again substantially affirm the March 17, 1978 judgment, including its provisions for use of a Special Master. The civil contempt, therefore, is of the orders of June 4, 1981 and July 14, 1981 which do no more than fix the amount and time of payment of the unreversed provision in paragraph 8 of the

6. 449 U.S. 980, 101 S.Ct. 393, 66 L.Ed.2d 242 (1980).

7. 448 U.S. 905, 100 S.Ct. 3046, 65 L.Ed.2d 1135 (1980).

8. See Memorandum of Judge Broderick, July 29, 1980, No. 78–1490, 42a–43a.

9. No. 78–1490, 39a.

10. Some defendants petitioned for a writ of mandamus which the Supreme Court on December 1, 1980 denied. In re Pennhurst Parent-Staff Association, 449 U.S. 1009, 101 S.Ct. 593, 66 L.Ed.2d 486 (1980).

11. Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

March 17, 1978 order that the expenses of the Masters' offices shall be borne by the Commonwealth.

## II

The Commonwealth of Pennsylvania appropriates funds annually for the Department of Public Welfare, of which Pennhurst is a part. For the fiscal years 1978–79, 1979–80 and 1980–81 general appropriations were made for State Centers for the Mentally Retarded, and from those appropriations payments were routinely made for the support of the Masters' offices. Sometime in late 1980 or early 1981 someone in the Department of Public Welfare conceived the idea of separating out from the general appropriation for State Centers for the Mentally Retarded a distinct appropriation for the operation of the Masters' offices. Secretary O'Bannon decided to depart from the prior practice, and was successful in having a separate item for the Masters' offices included in the Governor's budget requests. In testimony before the legislature O'Bannon voiced strong objections to the use of the Masters.[12] She explained that the anticipated cost was $900,000, and this colloquy took place:

> REPRESENTATIVE COHEN: I'm just curious as to what power we have here, if any. Suppose we cut it to $450,000? What would happen? We would be ordered to increase it to $900,000.00?
>
> SECRETARY O'BANNON: No. Because you're not defendants on the suit.
>
> REPRESENTATIVE COHEN: You as the Department?
>
> SECRETARY O'BANNON: I have no authority to increase it. I do not appropriate money.
>
> REPRESENTATIVE COHEN: So therefore, you are saying we do have authority to cut or increase?

> SECRETARY O'BANNON: Yes. And you always have that authority. Judge Broderick cannot take that away from you.
>
> REPRESENTATIVE COHEN: And Judge Broderick has no reasonable means of recourse?
>
> SECRETARY O'BANNON: Judge Broderick is a very clever jurist. I would not like to guess his means of recourse.
>
> REPRESENTATIVE COHEN: I am curious who would go to jail.
>
> REPRESENTATIVE ARTY: I will take you in to protective custody.
>
> .    .    .    .    .
>
> REPRESENTATIVE COHEN: And we have to pay the salaries?
>
> SECRETARY O'BANNON: I have been ordered to send a check every month.
>
> .    .    .    .    .
>
> REPRESENTATIVE COHEN: We have no recourse other than to slash the budget from $900,000.00? If we don't want you to go to jail?
>
> SECRETARY O'BANNON: You have all the recourse and power at your command and we will see what we will see. I am a risk taker. I wouldn't be in this job if I weren't.

16a–19a.

At the time of this colloquy the Supreme Court had not yet decided the case pending before it on certiorari. On March 2, 1981, the day before O'Bannon's testimony, the district judge, dissatisfied with the slow pace of implementation of the order that community living arrangements be found for qualified and interested Pennhurst residents, had entered a supplemental order calling for the provision of additional services to class members within a specified time frame.[13] No notice of appeal was filed

---

12. She testified, for example, "I think the whole masters office is a redundant, ridiculous piece of bureaucracy." 17a. Secretary O'Bannon was not in office when the Commonwealth, after the District Court's liability opinion, passed up the opportunity to suggest a less redundant but equally effective plan for achieving the relief the law required. There may be merit in her redundancy objection, but it was never advanced in the appropriate forum.

13. No. 78-1490, 47a.

with respect to the March 2, 1981 order,[14] but in the testimony before the legislature Secretary O'Bannon expressed her dissatisfaction with it. Indeed, she testified that if the Court's order went into effect and there were not appropriate support facilities "[w]e will not comply and we will be in contempt. I will not dump patients out of Pennhurst for any court order." 23a. At a later point in the legislative hearing the focus of the inquiry returned to the Office of Special Master, and this colloquy occurred:

> REPRESENTATIVE PITTS: Just one other question. The Office of Special Master, what did you say or what do you think would happen if we didn't not find [sic] this?
>
> SECRETARY O'BANNON: If you put no money in this line item, we would continue to pay it as we are presently being ordered to do out of the Pennhurst budget.
>
> REPRESENTATIVE PITTS: You would be obligated to do that?
>
> SECRETARY O'BANNON: I believe so.
>
> .    .    .    .    .
>
> MR. BROWN: I would like to follow up on what Representative Pitts was asking you, Madame Secretary, and take a little step further. This body has been known on occasion to write into a bill that thou shalt not. What would happen if we let the line item sit and say thou shall not pay any of Pennhurst's money to the Master?
>
> REPRESENTATIVE DeVERTER: We will go to jail.
>
> REPRESENTATIVE SIRIANNI: I am willing to go to jail.
>
> MR. BROWN: I would go, too. I don't expect you to answer that. . . .

30a–31a. There followed a brief discussion of the Willowbrook litigation in New York, and the fact that the New York legislature had omitted a line item in an appropriation for the funding of a hearing panel.[15] Secretary O'Bannon explained:

> On one level, I think it is a different situation because we are under litigation and this is an arm of the court. We have not consented. In Willowbrook, there was a consent decree in creation of a panel there. I would not be optimistic for this coming year that the technique would work, but maybe in subsequent years. But I am an optimist to believe that the Supreme Court is going to rule in favor of the Commonwealth and there will be no master and no Judge Broderick order after June 30, 1981. All of this discussion may be just for our own entertainment.

32a–33a.

Despite O'Bannon's dubiety about whether Mr. Brown's suggested technique would work, the Pennsylvania General Assembly accepted his suggestion. It appropriated, as a line item appropriation, $35,000 for the masters, adding:

> It is the intent of the General Assembly that this appropriation be used for shutdown costs and that no other funds of the Commonwealth be spent for these functions.

That appropriation bill was passed by the House on June 17 and the Senate on June 22 and signed by the Governor on July 1, 1981. As late as June 22, 1981 O'Bannon and others in the Department of Public Welfare discussed the possibility of requesting a veto of the legislative expression of intention, but no steps were taken to that end.[16]

---

**14.** On May 26, 1981 this court denied a motion to stay the March 2, 1981 order, from which no appeal had been taken.

**15.** See *New York State Ass'n for Retarded Children, Inc. v. Carey*, 631 F.2d 162 (2d Cir. 1980).

**16.** In other circumstances when the Governor of Pennsylvania learned that the legislature was attempting to interfere with a valid order of a federal court by passing a statute to abrogate that order, he refused to cooperate. In August 1978, the District Court for the Eastern district of Pennsylvania approved a consent decree requiring the Commonwealth to implement a motor vehicle emission inspection and maintenance program by May 1, 1981. *Dela-*

Meanwhile, before the appropriations bill became law, the district court's June 4 orders directing payment of the expenses of the Masters by July 1 was entered and served on the Commonwealth and O'Bannon. The Department's general counsel, on June 23, 1981, sent a memorandum to the Department's Comptroller advising him that the payments required by the June 4 orders should not be made. (Exhibit P. 34). In a letter dated June 29, 1981 the attorney for the Commonwealth defendants informed the court that the Commonwealth would pay no more for the Masters' expenses for the fiscal year July 1, 1981-July 30, 1982 than $35,000. Defendant Howse, a Deputy Secretary of the Department, on July 1, 1981 sent the Comptroller a conflicting instruction to comply with the June 4 orders (Exhibit P. 36), but the next day O'Bannon concluded that those orders should not be obeyed. The general counsel of the Department thereupon instructed the Comptroller to ignore Howse's instruction and to withhold payment. (Exhibit P. 37).

It appears, therefore, that as soon as the appropriations bill became law the Department of Public Welfare, acting through some of its highest officers, took the position that they would not obey the June 4 orders, and so advised the court. No Rule 60(b) motion was made for relief from either the June 4 payment orders or the underlying provisions of the March 17, 1978, April 24, 1980, July 14, 1980 or March 2, 1981 injunctions specifying the Masters' duties and the Commonwealth's obligation to fund their services.

When advised of the Commonwealth's position, the original plaintiffs moved for the issuance of an order directing the Commonwealth defendants to show cause why they should not be held in contempt. The moving papers referred to the March 17, 1978, April 24, 1980 and June 4, 1981 orders and

to the letter from counsel for the Commonwealth defendants informing the court that no funding for the masters would be made beyond $35,000. The defendants' answer admitted the facts alleged, but denied that they amounted to a contempt. An order to show cause issued, and on July 24, 1981 a hearing was held. At the hearing, counsel for respondents O'Bannon and the Commonwealth stated on the record that they were not contesting the underlying validity of the court orders. Transcript of July 14, 1981 Hearing at 90–100. They have consistently maintained that position. Before this court they assert:

> The sole issue [in the contempt proceeding] was defendants'/appellants' ability to comply with District Court orders requiring them to pay the expense of court-appointed masters. The propriety of those orders in and of themselves was not at issue.

Appellants' Reply Brief at 1.

O'Bannon did not testify in the contempt proceeding, but on her behalf it was urged that she acted in good faith but was prevented from obeying the court's orders by forces beyond her control. The district court, on the evidence presented, found that she was not acting in good faith, but had instigated the action of the legislature for the purpose of creating an excuse for dismantling the Masters' offices. 61a. The court found that O'Bannon and the Department of Public Welfare of the Commonwealth were in contempt of the June 4, 1981 and July 14, 1981 orders, and ordered:

> 1. The Department of Public Welfare and the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare, shall pay into the Registry of this Court civil fines totalling $10,000 per day for each day after September 2, 1981, that full payment has not been made pursuant to this Court's Orders of June 4, 1981 and July 14, 1981.

---

*ware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania*, No. 76–2068, 77–619 (E.D.Pa., Consent Decree Aug. 30, 1978). The Commonwealth missed the deadlines imposed by the decree, however, and the Court ordered the Commonwealth to implement the program by May 1, 1982. In 1981,

the legislature attempted to interfere with the Court's order, but Governor Thornburgh vetoed the bill. *See* Veto Message re House Bill 456 from Governor Thornburgh to the House of Representatives (July 10, 1981). The legislature subsequently overrode the veto.

2. In the event the Department of Public Welfare and the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare, do not make full payment pursuant to the Orders of June 4, 1981 and July 14, 1981 on or before September 2, 1981, the plaintiffs shall take such steps as are legally necessary to add the Honorable R. Budd Dwyer, Treasurer of the Commonwealth of Pennsylvania, as a party defendant in this action.

3. The Department of Public Welfare and the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare, shall appear before this Court on Thursday, October 15, 1981, at 9:30 A.M. in Courtroom 10B, United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, to show cause why the Court should not impose on them a compensatory fine in an amount sufficient to compensate the plaintiffs for the costs and counsel fees incurred in the preparation and trial of these contempt proceedings.

4. For the purpose of ascertaining the amount of the compensatory fine sufficient to compensate plaintiffs for costs and counsel fees, the plaintiffs shall submit affidavits on or before October 1, 1981, setting forth in detail the time expended by counsel, the matter upon which the time was expended, and the costs incurred in the preparation and trial of these contempt proceedings.

72a–73a. From this order O'Bannon and the Commonwealth appeal. Paragraph 3 of the order establishes that its intended effect is that the Commonwealth should pay the $10,000 a day civil fine. The parties agree that the payments required by the June 4 and July 14, 1981 orders have never been made, and that the Commonwealth has, since September 2, 1981, paid into the Registry of the District Court fines at the rate of $10,000 a day.[17] By order of January 8, 1982, the District Court relieved the Commonwealth of the obligation to continue to pay into the Registry of the Court the

coercive and compensatory civil fine and purged the Commonwealth Department of Public Welfare and Secretary O'Bannon of civil contempt.

### III

The provisions of the District Court's order and the nature of a civil contempt proceeding present difficult questions of appellate jurisdiction and assuming such, of scope of review.

### A

■ Appellees suggest that this appeal must be dismissed because it is from a non-final unappealable order, and rely on the recent en banc decision of this court in *Croker v. Boeing Co.*, 662 F.2d 975, 980 (3d Cir. 1981). In *Croker v. Boeing Co.*, we held that "a judgment in a case such as this may not be considered final for purposes of appeal until a district court has determined the extent of liability for any attorney's fees to be awarded." *Id.* at 983. Because paragraphs 3 and 4 of the order appealed from leave open the question whether costs and counsel fees shall be awarded to the plaintiffs, and if so, the amount thereof, appellees argue that *Croker v. Boeing Co.* is dispositive.

*Croker v. Boeing Co.* is, however, distinguishable both on its facts and for the underlying policy reasons on which it is premised. That case presented the issue whether an appeal in an action involving money damages could be taken where the only issue unresolved was the amount of attorney's fees to be awarded. The holding of the court that it could not was based on two policy reasons: making certain the time when an appeal *must* be taken; and bringing before a single appellate panel all claims in a case at one time.

In this case, the primary issue has been the injunctive relief to which plaintiffs are entitled. Although we do not hold that an appeal from an order of civil contempt in an injunction action comes within the language of 28 U.S.C. § 1292(a) permitting immedi-

---

**17.** The records of the Clerk of the United States District Court for the Eastern District of Pennsylvania disclose that fines totaling $1,200,000 have been paid by the Commonwealth.

ate appeal from orders granting or denying injunctive relief, an examination of the history of this action shows why the *Croker v. Boeing Co.* holding is inapplicable. For example, the appeal from the 1978 order was heard by us, by the Supreme Court, and by us on remand from the Supreme Court, while applications for attorney's fees and costs remained, and still remain, undetermined in the District Court. It is quite likely in a situation such as presented here, where the contempt arose after the grant of a permanent injunction, that we will in the future be called upon to review whatever action is taken with respect to fees in the underlying action. Because Section 1292(a) permitted the earlier appeal it was never possible to achieve the policy of *Croker v. Boeing Co.* of bringing all claims in the case before a single appellate panel at one time.

Furthermore, civil contempt, like the injunctions and orders in the nature of injunctions which are appealable under section 1292(a), is coercive in an ongoing sense. If the order were to remain unreviewed while lengthy hearings went forward on fee applications, possible irreparable consequences to the parties might result. For example, a civil coercive contempt order committing a party to jail which represented the final issue on the merits could remain unreviewed while fee hearings went forward, or even worse, while no action was undertaken to bring the fee matter to a speedy resolution.

Finally, in a recent case we have explained that the holding in *Croker v. Boeing Co.* represents an interpretation of the single judicial unit rule embodied in Rule 54(b), and not an interpretation of finality governed by 28 U.S.C. § 1291. See *de Mouy v. Ingvoldstad*, 664 F.2d 21, 22 (3d Cir. 1981). *See also Sibbach v. Wilson & Co., Inc.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1940) (civil contempt order reviewed as a final judgment). Since Rule 54(b) is concerned with appeals before the disposition of fewer than all of the claims or parties, it is questionable whether it has any applicability here, where the contempt was entered after the grant of a permanent injunction and no other substantive relief is sought.

For all of these reasons, we conclude that the rule announced in *Croker v. Boeing* does not require that the appeal be dismissed. We turn therefore to the scope of review.

**B**

■ Although the appellants have urged otherwise, it is plain that the order appealed from is a civil, not a criminal contempt judgment. For civil contempt orders the settled rule is that, when directed against parties, such orders are interlocutory and unreviewable except incident to an appeal from a judgment otherwise appealable. *E.g., McCrone v. United States*, 307 U.S. 61, 59 S.Ct. 685, 83 L.Ed. 1108 (1939); *Fox v. Capital Co.*, 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67 (1936); *Doyle v. London Guarantee Co.*, 204 U.S. 599, 27 S.Ct. 313, 51 L.Ed. 641 (1907); *Latrobe Steel Co. v. United Steelworkers*, 545 F.2d 1336, 1340 (3d Cir. 1976); *Firemen's Fund Insurance Co. v. Myers*, 439 F.2d 834, 837 (3d Cir. 1971). O'Bannon and the Commonwealth contend that because the contempt order here was entered in a post-permanent injunction proceeding, it is final and appealable because there is no other judgment from which an appeal may lie. However, those cases which recognize the reviewability of post-judgment civil contempts narrowly circumscribe the issues which may be considered. Only issues which could not otherwise be subject to appellate review by the ordinary processes of the Federal Rules have been considered. In *Penfield Co. v. SEC*, 330 U.S. 585, 67 S.Ct. 918, 91 L.Ed. 1117 (1947), and *Lamb v. Cramer*, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715 (1932), for example, the Supreme Court reviewed cases in which, on a party's motion for coercive civil contempt to enforce a final judgment, a lower court refused to enter an effective coercive order. *See also, Stringfellow v. Haines*, 309 F.2d 910 (2d Cir. 1962). In *Reed v. Cleveland Board of Education*, 607 F.2d 749 (6th Cir. 1979), the Court of Appeals considered contentions that one contempt order was entered without notice and a hearing, and that another was entered for violation of an order which did not give fair notice of pre-

scribed conduct. In *Vincent v. Local 294, International Brotherhood of Teamsters,* 424 F.2d 124 (2d Cir. 1970), the Court of Appeals, although dismissing the appeal as moot, suggested that it had jurisdiction to consider the question whether the contemnor had in fact disobeyed the order. None of those cases suggest any erosion of the settled rule that the merits of the underlying order may not be called into question in a post-judgment civil contempt proceeding. *Oriel v. Russel,* 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (1929).

There are strong policy reasons for limiting review, even in post-final judgment contempt proceedings, to matters which do not invalidate the underlying order. If a civil contemnor could raise on appeal any substantive defense to the underlying order by disobeying it, the time limits specified in Fed.R.App.P. 4(a) would easily be set to naught. In cases such as this, where a timely appeal was taken from at least one of the underlying orders, recognizing the possibility of relitigation of the merits of that order presents the prospect of perpetual relitigation, and thus destroys the finality of judgments of both appellate and trial courts. These considerations militate strongly against the pronouncement of an interpretation of 28 U.S.C. § 1291 which would permit review in a civil contempt proceeding of any attack on validity which that party could raise or could have raised by an appeal reviewing the underlying order.

In this appeal O'Bannon and the Commonwealth concede that they have disobeyed the June 4 and July 14 orders. They concede that those orders gave them fair notice. They make no procedural objection to the contempt hearing. They concede, as well, that for purposes of this proceeding those orders are valid. By this last concession they apparently seek to set themselves outside the rule of *Oriel v. Russel, supra,* and outside the ambit of the policy reasons discussed in the preceding paragraph. Their contention is that the change in Pennsylvania law made on June 23, 1981, when the Governor signed the appropriation bill containing the legislature's mandate to dis-

obey the injunction requiring that the Commonwealth fund the Masters' offices, is a circumstance which could not be brought to this court's attention by appeal from any order other than this civil contempt order. That contention is inaccurate. At the time the Secretary and the Department of Public Welfare made the deliberate and considered choice to advise the Court that it intended to disobey the June 4, 1981 payment order it was open to those defendants to move before the District Court under Rule 60(b)(5) or (6) for relief from paragraph 8 of the March 17, 1978 judgment on the ground that the action of the Pennsylvania legislature justified relieving the Commonwealth from the obligation there imposed. Had such a motion been made and denied, an appeal of right could have been carried here pursuant to 28 U.S.C. § 1292(a)(1). Thus it cannot be said that this is a case in which no other route to appellate review except self-help was available to the contemnors. Moreover by resorting to self-help in a situation where a post-judgment change in the law is arguably a reason for relief from the judgment, a party subject to that judgment deprives the other side of the notice and opportunity to be heard which Rule 60(b) would otherwise require, and of the protection of the provision in that rule that "[a] motion under this subdivision (b) does not affect the finality of the judgment or suspend its operation." The rule contemplates consideration by the trial court of the competing equities, of the strengths and weaknesses of the parties' positions, and of the imposition of conditions for relief from a judgment. It contemplates that an appeal will come before us with a record reflecting those considerations. The self-help route leaves the trial court with no alternative except restoration of the status quo ante bellum by a coercive contempt order.

Had a Rule 60(b) motion been made, the District Court could have been informed of alternative means, if any, for the performance of those functions now being carried out by the Special Master and Hearing Masters, and would have been able to make an informed decision as to the advisability of

modifying paragraph 8 of the March 17, 1978 judgment. Instead, as the colloquy before the legislature and O'Bannon's countermand of Assistant Secretary Howse's direction to the Comptroller to honor the June 4 payment orders amply demonstrate, the Commonwealth Department of Public Welfare deliberately chose to avoid an orderly presentation of the contention that the legislature's action warranted some alternative to paragraph 8, and to force an immediate confrontation. Even in responding to the order directing that they show cause why they should not be held in contempt neither O'Bannon nor the Commonwealth filed a paper with or made an argument to the district court which could by appellate ingenuity be tortured into a request for consideration of a modification of paragraph 8. Instead, their position was that the action of the Pennsylvania legislature relieved them of the obligation to obey that paragraph. Since the question whether the action of the Pennsylvania legislature requires a modification of the underlying orders imposing on the Commonwealth the expenses of the Masters' offices could have been raised in a Rule 60(b) motion, and we would have appellate jurisdiction over an order granting or denying Rule 60(b) relief, we hold that the effect on the underlying orders of the appropriations act may not be considered in an appeal from a civil contempt order. Any other holding would be an open invitation to any party subject to an injunction to resort to self-help whenever in its view some change in the law warranted relief from a judgment.

■ O'Bannon and the Commonwealth urge that even if the action of the Pennsylvania legislature could have been called to the trial court's attention by a Rule 60(b) motion, we should at least consider on this appeal their contention that the appropriations act made performance of the funding obligation "impossible." For this contention they rely upon *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948). For several reasons that case is not dispositive. In the first place, the Supreme Court's appellate jurisdiction in reviewing a decision of a federal court of appeals does not depend upon whether the order is final or interlocutory, but only upon whether the case was properly in the court of appeals. 28 U.S.C. § 1254. *Maggio v. Zeitz* involved a contempt of a turnover order in a bankruptcy proceeding. The contempt proceeding was specifically authorized by the former Bankruptcy Act. 11 U.S.C. § 11(a)(16) (repealed 1979). Appellate jurisdiction in the Second Circuit turned not on the predecessor to 28 U.S.C. § 1291, but on the former 11 U.S.C. § 47(a) (repealed 1979), which authorized review of orders "in proceedings in bankruptcy," whether interlocutory or final. See *In re Luma Camera Service, Inc.*, 157 F.2d 951 (2d Cir. 1946), *vacated*, *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948) (review of contempt proceeding in the matter of Luma Camera Service, Inc., bankrupt; Maggio, contemnor). Thus a final order from the District Court was not a necessary predicate to appellate jurisdiction in *Maggio v. Zeitz*.[18] Moreover, the "impossibility" of which the Court speaks in that case is literal physical impossibility of compliance, and not, as here claimed, a subsequent change in the law allegedly making compliance illegal though physically possible.[19] Whether in cases of literal physical impossibility of compliance a party to a final judgment must raise that contention in a Rule 60(b) motion for relief from its terms in order to seek appellate review is a question of first impression.[20] We hold that a party may

**18.** *See also, In re Cantwell*, 639 F.2d 1050, 1052 (3d Cir. 1981); *In re W. F. Breuss, Inc.*, 586 F.2d 983, 985 (3d Cir. 1978); *In re Imperial "400" National, Inc.*, 391 F.2d 163, 167 (3d Cir. 1968).

**19.** The Commonwealth's physical ability to pay can hardly be doubted. It has paid $1,200,000 in civil fines.

**20.** That question is not decided by cases recognizing physical impossibility as a reason for withholding or terminating a contempt order. *Shilletani v. United States*, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966); *United States v. Bryan*, 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1949); *United States v. Asay*, 614 F.2d 655, 660 (9th Cir.

raise such a contention in defense to a civil contempt citation. We also hold that in the circumstances here, where the contemnor participated in effectuating the change in the law which is alleged to establish a legal impossibility, sound policy does not permit the by-passing of the orderly route to appellate review provided by Rule 60(b).

Our insistence that relief from the judgment should first be presented to the District Court in an orderly manner should not be construed as an expression of hostility to the spirit of economy voiced by Secretary O'Bannon and the Pennsylvania Legislature. If, in fact, the Masters' operations are now, as O'Bannon told the Legislature, redundant, the District Court must take the redundancy into account in ruling on a Rule 60(b) motion to modify the injunction. When the Court acted on March 17, 1978 the Commonwealth defendants, the County defendants, the Pennhurst staff and some parents of inmates opposed any significant relief. In face of such intransigence few, if any, alternatives were available to the Court than to resort to the use of Court appointed monitors.[21] If the situation has changed significantly the defendants remain free even now to make a Rule 60(b) motion for relief from the judgment. If such a motion is made, we are confident that a less elaborate monitoring system will be carefully considered by the District Court.

## C

One remaining objection to the civil contempt order, not presented to the District Court and not briefed by the appellants, but adverted to at oral argument of the appeal, remains to be considered. Fed. R.Civ.P. 53(a), dealing with the use of masters, provides in part:

The compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties . . . as the court may direct. The master shall not retain his report as security for his compensation; but when the party ordered to pay the compensation allowed by the court does not pay it after notice and within the time prescribed by the court, *the master is entitled to a writ of execution against the delinquent party.* (Emphasis supplied).

At oral argument the suggestion was made that the italicized language may mean that for recovery of expenses for the Masters' offices a writ of execution is a preferred remedy which should be resorted to before holding a state officer or the Commonwealth in contempt. Such an issue obviously would qualify as one which could not be raised either in an appeal from the underlying order or by a Rule 60(b) motion, and its consideration is not precluded by the analysis in Part III B above. There is, however, an insurmountable barrier to its consideration at this time. Ordinarily we do not consider as reasons for a reversal of an order matters which were not first presented to the District Court. *E.g., Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1975); *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 680 (3d Cir. 1980); *Teen-Ed Inc. v. Kimball International Inc.*, 620 F.2d 399, 401 (3d Cir. 1980); *Toyota Industrial Trucks USA, Inc. v. Citizen's National Bank of Evans City*, 611 F.2d 465 (3d Cir. 1979). That rule is not a bar to our consideration of plain error. *E.g., Weaver v. Bowers*, 657 F.2d 1356, 1361 (3d Cir. 1981); *Switlik v. Hardwicke Co.*, 651 F.2d 852, 857 (3d Cir. 1981); *United States v. Palmeri*, 630 F.2d 192, 201 (3d Cir. 1980), *cert. denied*, 450 U.S. 967, 101

1980); *United States v. Wendy*, 575 F.2d 1025 (2d Cir. 1978). Those cases all involved non-party witnesses and thus were reviewable by virtue of the *Alexander-Bessette* interpretation of § 1291. *See Alexander v. United States*, 201 U.S. 117, 26 S.Ct. 356, 50 L.Ed. 686 (1906); *Bessette v. W. B. Conkey Co.*, 194 U.S. 324, 24 S.Ct. 665, 48 L.Ed. 997 (1904); *Fenton v. Walling*, 139 F.2d 608 (9th Cir. 1943), *cert. denied*, 321 U.S. 798, 64 S.Ct. 938, 88 L.Ed. 1086 (1944).

21. In *Rennie v. Klein*, 653 F.2d 836, 849 (3d Cir. 1981) (en banc), this Court held that when state procedures facially complied with constitutional requirements and state officials were in good faith implementing them, additional procedures should not be ordered. In this case, in sharp contrast, in 1978 the defendants were firmly resisting any relief.

S.Ct. 1484, 67 L.Ed.2d 616 (1981). The District Court's order cannot be so considered, however, for even if execution is a preferred remedy, an issue we need not decide, its choice or rejection would require the exercise of an informed discretion. No opportunity was ever presented to the trial court to exercise such discretion, since the Commonwealth defendants never urged a writ of execution as an alternative remedy.

### IV

The contention that the change in Pennsylvania law is a reason for relieving the defendants of the obligation to fund the Masters' offices will not be accepted as a defense to civil contempt in this case. It must be presented to the District Court in a Rule 60(b) motion for relief from the judgment. No other defense to the contempt order was advanced in the District Court. The order appealed from will, therefore, be affirmed.

ALDISERT, Circuit Judge, concurring.

I join in the majority opinion, except for the small portion of Part I that relies on our prior adjudication in this case as if it were a binding precedent. I believe it is more accurate merely to state that a previous majority opinion of this court, 612 F.2d 84 (3d Cir. 1979) (in banc), supporting a judgment subsequently reversed by the Supreme Court, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), rejected an attack on the district court's appointment of a special master. See 612 F.2d at 111–12. In the face of the Supreme Court's reversal, I am unwilling to accord any precedential vitality to that opinion.

Nevertheless, I join the majority because I am unwilling to assume a posture that would put this court out of touch with reality. It would serve no useful purpose to conduct an academic exercise that would further prolong these proceedings, in which counsel for all the litigants have shown more interest in seeking judicial endorsement of their idiosyncratic views of the law than in properly resolving a truly difficult dispute.

This is not an ordinary contempt proceeding. Rather, it is a vehicle chosen by the district judge to obtain Commonwealth financing for his employment of masters to implement his remedy. That financing has now been secured up to June 1982. To hold now that the appointment of the masters was invalid *ab initio* would serve no realistic function. The work has been performed, the funds have been expended, and there is simply no way to undo the work performed by the masters or to return the funds to the Commonwealth. Moreover, it would be counterproductive to readjust the status or classification of the Pennhurst residents who have been processed by the masters. It would have been preferable, however, for this court to have granted the motion for a stay so that the issue could have been resolved before the expenditure of massive funds in the form of civil contempt fines. I voted for a stay, but both the majority of this court and the Supreme Court ruled otherwise. It also would have been preferable to expedite these proceedings before a panel. I voted against an initial hearing in banc because of the scheduling and other delays inherent in our in banc procedure, but again a majority of this court voted otherwise.

Accordingly, because I am disenchanted with the establishment of the masters' apparatus, I believe that we should remove these proceedings from the appellate level and return them to the district court as soon as possible. Appellants then may move for relief under Fed.R.Civ.P. 60(b), allowing the district court to act immediately to have its remedy implemented by state officers under state law.

It is for these very pragmatic reasons that I join the majority. I do this to give Secretary O'Bannon the earliest possible opportunity to make a presentation on the basis of changed circumstances. Moreover, I would have our mandate issue forthwith so that the proceedings in the district court would not be further delayed.

GARTH, Circuit Judge, concurring in part and dissenting in part, with whom JAMES HUNTER, III, Circuit Judge, joins.

I agree with the majority that this court has jurisdiction over the contempt appeal at

81–2381. I reach this conclusion by a different route from the majority, however, for I believe that *Latrobe Steel Co. v. United Steelworkers*, 545 F.2d 1336, 1340 (3d Cir. 1976), and *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1179 (3d Cir. 1976), establish that this court has jurisdiction to decide the validity of the contempt order in conjunction with the appeals of the district court's orders of March 17, 1978, and July 14, 1981. As for the merits of the appeal in this case, I would hold that because the underlying orders appointing a Master at Pennsylvania's expense were improper, the contempt order must fall as well.

### I.

Considered by itself, the district court's August 25, 1981, contempt order would not be appealable. It is not an "injunction" and thus there is no appellate jurisdiction under § 1292. Nor is it a "final order" appealable under § 1291. Under this court's decision in *Croker v. Boeing Co. (Vertol Div.)*, 662 F.2d 975 (3d Cir. 1981) (en banc), so long as attorney's fees remain undetermined, an order is not "final" for our jurisdiction to attach. In this case, the district court's order holding the Commonwealth defendants in contempt reserved decision on whether the plaintiffs should be awarded attorney's fees incurred in conjunction with the contempt proceedings. In my view, *Croker* is controlling here, and undermines any argument that this court has jurisdiction under § 1291 to hear the appeal of the district court's order of August 25, 1981.

Nevertheless, I believe that the contempt appeal is properly before this court under *Latrobe Steel Co. v. United Steelworkers*, 545 F.2d 1336 (3d Cir. 1976), *United States*

*v. Spectro Foods Corp.*, 544 F.2d 1175 (3d Cir. 1976), and many other similar cases. In those cases, a preliminary injunction had been issued, followed by an order holding one of the parties in contempt for violating the injunction. In such cases, where an appeal has been taken from the preliminary injunction, this court has repeatedly held that

> although an adjudication of civil contempt is not ordinarily appealable [until a "final decision" has been rendered], it is well established that an appellate court may consider the matter of a civil contempt in connection with an appeal from the underlying preliminary injunction.

*Latrobe, supra*, 545 F.2d at 1340 (footnote omitted). *Accord, Spectro Foods, supra*, 544 F.2d at 1179. The logic of these decisions appears to rest on the principle that, because civil contempt is remedial, not punitive, in nature,

> the reversal of the [preliminary injunction] decree ... does more than destroy the future sanction of the decree. It adjudges that it never should have passed; that the right which it affected to create was no right at all. To let the liability stand for past contumacy would be to give the plaintiff a remedy not for a right but for a wrong, which the law should not do.

*Salvage Process Corp. v. Acme Tank Cleaning Process Corp.*, 86 F.2d 727, 727 (2d Cir. 1936). *See also United States v. United Mine Workers*, 330 U.S. 258, 295, 67 S.Ct. 677, 696–97, 91 L.Ed. 884 (1947); *Bethlehem Mines Corp. v. United Mine Workers*, 476 F.2d 860, 864–67 (3d Cir. 1973).[1]

This "well-established" doctrine provides an entirely sufficient basis for jurisdiction over the present contempt appeal.[2] In this

---

**1.** To be sure, this court, sitting *en banc*, could overrule the panel decisions in *Latrobe* and similar cases. I can think of no reason for doing so, however, and I note that as recently as February 1, 1982, this court sitting *en banc* went out of its way to note the continuing vitality of *Latrobe* and *Spectro*. *See Kershner v. Mazurkiewicz*, 670 F.2d 440, 449 n.12 (3d Cir. Feb. 1, 1982) (en banc).

**2.** Both the majority and Chief Judge Seitz are therefore incorrect in focusing their respective analyses solely on the question of the appealability of the contempt order under § 1291.

In my view, the majority's attempt to distinguish *Croker* needlessly clouds the law of "finality" under § 1291, and raises the prospect of numerous arguments in the future that the "underlying policy" of *Croker* is inapposite in this or that particular set of circumstances. Even

case the underlying injunctive orders—the court's permanent injunction of March 17, 1978, and the related payment orders of July 14, 1981, issued pursuant to that injunction—have been timely appealed. Thus, to paraphrase *Latrobe*, although the district court's contempt order of August 25, 1981, would not ordinarily be appealable, it is clear that this court may consider that contempt order in connection with the appeal from the underlying injunctive orders of March 17, 1978, and July 14, 1981.[3]

## II.

As I have indicated in my separate opinion in the appeals at Nos. 81–2448 and 81–2449, *see* 673 F.2d at 646–47, the district court's orders of July 14, 1981, requiring payment to the Special Master and the Hearing Master, were improper. And as the underlying orders upon which the contempt was predicated cannot stand, neither can the adjudication of contempt itself be upheld. In accordance with the views that I have expressed in this opinion, and in my separate opinions in the merits appeals, *see* 673 F.2d at 662–71, and the payment orders, *see* 673 F.2d at 646–47, I would remand all the cases to the district court with two instructions. First and foremost, I would direct the district court to enter an order doing no more

than enjoining the Commonwealth to comply with its own statutes, regulations and decisional laws affecting the care of the plaintiffs, thereby discontinuing the offices of the Special Master and the Hearing Master. Second, I would direct the district court to return to the Commonwealth any as-yet unspent moneys accumulated from the $10,000-a-day civil contempt fine, and, if requested by the Commonwealth, to resolve any questions concerning moneys already spent.[4]

Thus to the extent that the majority holds that appellate jurisdiction attaches to the contempt appeal at 81–2381 I am in agreement with that determination, even though the basis of my agreement is substantially different than the theory on which the majority proceeds. To the extent, however, that the majority has declined to discharge the contempt I must respectfully dissent for the reasons which I have specified.

SEITZ, Chief Judge, dissenting.

I do not believe the contempt order of August 25, 1981 is appealable, and would dismiss the appeal for lack of appellate jurisdiction. I agree with the majority that the basis of our jurisdiction in the appeals from the district court's order of March 17,

---

assuming for the sake of argument that it is desirable to begin carving exceptions into the rule so recently announced in *Croker*, I cannot understand the need to do so in this case, in which another, well-established basis for jurisdiction is presented.

Chief Judge Seitz, on the other hand, is correct in arguing, in his separate dissenting opinion in No. 81–2381, that this court has no jurisdiction over the contempt appeal under § 1291; but he apparently overlooks another fount of jurisdiction which does support an appeal from the contempt order. In the cases cited in Judge Seitz's opinion, the contempt was not appealed in conjunction with an appeal of an *injunctive* order, as it was in *Latrobe* and *Spectro Foods*, and as it is here. Thus while relevant to appellate jurisdiction under § 1291, the cases cited by Judge Seitz have no relevance to, and indeed in no way bring into question, this court's jurisdiction under § 1292 over the appeal at No. 81–2381.

3. Because, as is evident from the above discussion, I conclude that this court has jurisdiction in No. 81–2381 under the *Latrobe* doctrine, I do

not find it necessary to address any other aspects of appealability, such as the nature of the issues that may be raised on § 1291 appeals from post-judgment contempt orders. *Cf.* Maj. Op. in No. 81–2381, at 636–639.

4. A reversal in Nos. 81–2448 and 81–2449 on the ground that Pennsylvania should not have been ordered to pay for the expenses of the Master would entitle the Commonwealth, on remand, to seek reimbursement for the moneys already deducted from the accumulated civil contempt fine and applied to the Master's expenses. I recognize, however, that because Pennsylvania had a state-law duty to perform the same functions that the Master was performing, it would have had to expend its own funds as it carried out its state-law duties. It would be for the district court in the first instance to determine whether in so doing the Commonwealth would have had to expend the same amount of money as it was required to pay in the payment orders, and if not, to make whatever adjustments as might be necessary.

1978 is 28 U.S.C. § 1292(a)(1) (1976). Because plaintiffs' attorneys' fees incurred in securing the injunction have not been set, we do not have jurisdiction of those appeals under 28 U.S.C. § 1291 (1976). *See Croker v. The Boeing Co. (Vertol Division)*, 662 F.2d 975, 983–84 (3d Cir. 1981) (in banc).

I believe that because the 1978 order is not a final decision under section 1291, we do not have jurisdiction to review the contempt order. It has long been settled that "except in connection with an appeal from a final judgment or decree, a party to a suit may not review upon appeal an order fining or imprisoning him for the commission of civil contempt." *Fox v. Capital Co.*, 299 U.S. 105, 107, 57 S.Ct. 57, 58, 81 L.Ed. 67 (1936). *See Fireman's Fund Insurance Co. v. Myers*, 439 F.2d 834, 838 (3d Cir. 1971). *See also Lamb v. Cramer*, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715 (1932) (post-final judgment contempt order appealable). Because the contempt order in this case precedes final judgment, I disagree with the majority's conclusion that it is appealable under section 1291, and believe that appellate review of the contempt order must await final judgment in the principal action. As in any case where a civil contempt order is not immediately appealable, the result may cause hardship to the contemnors. Nonetheless, I believe the appeal from the contempt order must be dismissed.

The Commonwealth defendants suggest that if we lack appellate jurisdiction to review the contempt order, then a writ of mandamus should issue. I do not believe the circumstances of this case justify this extraordinary remedy. *See Rodgers v. United States Steel Corp.*, 508 F.2d 152, 161 (3d Cir.), *cert. denied*, 420 U.S. 969, 95 S.Ct. 1386, 43 L.Ed.2d 649 (1975).

## SUR PETITION FOR REHEARING
GIBBONS, Circuit Judge.

The Commonwealth Defendants have filed a petition for rehearing from our en banc decision filed on February 26, 1982. They make two contentions worthy of comment.

First, Paragraph 7 of the petition states that the District Court never ruled on motions filed by each of the defendants to amend or alter the District Court's Order of March 2, 1981, and that they therefore "justifiably believed that filing a Rule 60(b) motion in relation to this matter would be a futile act." This statement is significantly misleading.

There was no connection between the provisions in the March 2, 1981 Order of the District Court, to which a motion to amend or alter was addressed, and the June 4, 1981 and July 14, 1981 payment orders which were the orders that the Commonwealth disobeyed.

The March 2 Order provided for additional services to class members. The motion to amend or alter that order, filed on March 11, 1981, basically quarrels with the District Court's schedule for provision of those services, and with the meaning of the Supreme Court's partial stay of the previous order of this court. The motion to amend or alter the March 2 order challenges neither establishment of the Masters' offices, nor the Commonwealth's obligation to fund them.

On August 25, 1981 the Commonwealth defendants were held in contempt for disobeying two orders directing payment of costs for the Masters. In their appeal from the judgment of contempt, the Commonwealth's defense was impossibility of performance based on a change in Pennsylvania law. This argument was not presented in the March 11 motion to alter or amend the judgment. Indeed it could not have been since the Pennsylvania legislature only passed the statute disallowing further funding of the Masters in June of 1981. The March 11 motion thus does not undermine the conclusion in the opinion of the court that the Commonwealth defendants never appealed or moved to reconsider Paragraph 8 of the District Court's March 17, 1978 judgment, but instead simply resorted to self-help. For the reasons set forth in the opinion of the court, a Rule 60(b) motion was necessary.

Second, the petition for rehearing argues that the Supreme Court's recent opinion in

*White v. New Hampshire Department of Employment Security,* —— U.S. ——, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), undercuts this court's recent holding in *Croker v. Boeing Co.,* 662 F.2d 975 (3d Cir. 1981) (en banc), that where a decision on attorney's fees is outstanding, there is not a final order which can be reviewed by the Court of Appeals. Appellants are correct that the holding of *White v. New Hampshire Department of Employment Security* that a request for attorney's fees raises legal issues collateral to the main cause of action overrules the portion of our opinion in *Croker* dealing with appealability when application, for attorney's fees are not fully determined. Since the *Croker* rule no longer has any vitality, litigants in this circuit should rely on our previous holdings in *De-Long Corp. v. Raymond Intern., Inc.,* 622 F.2d 1135, 1138–39 n.3 (3d Cir. 1980), and *Baughman v. Cooper-Jarrett, Inc.,* 530 F.2d 529, 531 n.2 (3d Cir.), *cert. denied,* 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976), that orders disposing finally of the merits are appealable even though the questions relating to attorney's fees have been left undetermined.

The demise of the *Croker* rule on appealability does not, however, affect our holding in *Halderman v. Pennhurst* that the judgment of civil contempt was an appealable order. The opinion of the court distinguished *Croker,* we now know unnecessarily. Although the appealability holding in *Croker* has been overruled, *White* does not provide the petitioners with any support for their petition for rehearing.[1]

The petition for rehearing will be denied.

GARTH, Circuit Judge, concurring, with whom Judge Hunter joins.

Judge Gibbons, writing for the court, has denied the Commonwealth's Petition for Rehearing. I agree that the Petition should be denied, even though I maintain my disagreement with the Rule 60(b) argument found in the majority opinion. I therefore continue to hold to the view that because the payment orders and the order appointing a Master were improper, the contempt must fall as well. Nevertheless, I am in accord with the conclusion that the Commonwealth's assertions regarding its motion to alter or amend the district court's order of March 2, 1981, raise no issue requiring further consideration by this court.

I also agree that this court's decision in *Croker v. Boeing Co.,* 662 F.2d 975, 981–84 (3d Cir. 1981) (en banc), is inconsistent with the Supreme Court's recent decision in *White v. New Hampshire Department of Employment Security,* —— U.S. ——, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), and that therefore this Circuit's *Croker* rule of appealability no longer has any vitality. I am concerned of course that this change in the time when an order becomes appealable may have unforeseen and dire effects on cases which are in our pipeline. It may also have a severe impact on parties who, in reliance on *Croker,* have taken no appeal from orders that are still awaiting determination of attorney's fees, only to find now that under *White* the order should have been appealed at the time of judgment and that the time for appeal has thus already passed. Yet, having once confronted this issue and having concluded at that time that prudential as well as jurisprudential considerations were best served by the *Croker* rule, there is little more to be said now that *Croker* has been effectively rejected by the Supreme Court's opinion in *White.*

While this change in the law of finality does not, of course, affect my earlier conclusion that the contempt order in this case was appealable, it does obviate the need to rely solely on *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336 (3d Cir. 1976), and *United States v. Spectro Foods Corp.,* 544 F.2d 1175 (3d Cir. 1976), in support of

1. Chief Judge Seitz agrees that *White v. New Hampshire Department of Employment Security,* —— U.S. ——, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), overrules *Croker v. Boeing Co (Vertol Division),* 662 F.2d 975 (3d Cir. 1981)

(en banc), insofar as *Croker* held that there is no appealable "final decision" for purposes of 28 U.S.C. § 1291 (1976) until attorneys' fees have been set. *See* —— U.S. at —— & n.14, 102 S.Ct. at 1167 & n.14.

jurisdiction under 28 U.S.C. § 1292. Accordingly, to the extent that I previously argued that jurisdiction over the contempt appeal could not be predicated on 28 U.S.C. § 1291, *White* has now persuaded me otherwise.

In all other respects, however, while I join in denying the Commonwealth's Petition, I continue to adhere to my previously announced position, as it is expressed in the separate opinion which I filed urging that the contempt order should be overturned.